UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN SYLVA, Administrator of the Estate of CHARLES SYLVA,<br>       Plaintiff,<br><br>v.<br><br>THE CITY OF QUINCY, MICHAEL O'BRIEN, GERRY NICHOLS, JAMES BORDEN, KEVIN TOBIN, ROBERT CROWLEY, and JOHN KELLEY,<br>       Defendants. | C.A. NO. 03-12473-REK |

**PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS**

Pursuant to L.R. 56.1, Plaintiff hereby submits this Concise Statement of Material Facts of record in support of his opposition to Defendants' Motion for Summary Judgment:

1. On December 17, 2000, Charles Sylva was found dead in a cell at the Quincy Police Department. See Report of Trooper Lilly, attached hereto as Exhibit G. His cause of death was a "medically untreated violent and prolonged Acute Psychosis with Exhaustion." See Report of Doctor Baden, attached hereto as Exhibit I.

2. The autopsy revealed fresh bruises and hemorrhages on the arms and legs, as well as two anterior rib fractures. There were at least eight distinct and separate blunt force impact sites on the head. There were fresh hemorrhages behind the esophagus and pharynx and in the vocal cords. The brain was swollen. There were prominent circular handcuff abrasions around both wrists. Although Charles Sylva had cocaine in his system at death, he did not die of acute cocaine intoxication. The cocaine may have triggered off the acute paranoid psychotic reaction which would have been easily treated if he had been brought to a hospital. See Ex. I.

3. Earlier that day plaintiff had been arrested for breaking and entering and malicious damage to property. See Quincy Police Department Arrest Report, attached hereto as

      Exhibit A.  At the time he was arrested, Charles Sylva was paranoid, disoriented, and ranting and raving that people were trying to kill him.  O'Brien Deposition, Ex. B at 40; Tobin Deposition, Ex. C at 19.  The first thing Defendant O'Brien noticed about Charles Sylva when he was brought in was that he was soaking wet, like he had been sweating.  Ex. B at 40.

4. On the night of the incident Defendant Gerry Nichols was working with Defendant O'Brien.  Ex. B at 15.  Defendant Tobin also was on duty that night as the booking sergeant, or desk sergeant, beginning at 1:30 a.m.  Ex. C at 15-16, 19-20.  Lieutenant Kelley was in charge of the station.  Ex. C at 15-16.

5. Defendant James Borden and police officer Tom McGaya brought in Charles Sylva from the sally port and told Defendant O'Brien that the charges were breaking and entering.  Ex. B at 15, 50; Ex. C at 69-70:  Charles Sylva was handcuffed but not in leg irons.  Ex. B at 15, 50.  Defendant O'Brien brought Charles Sylva to the booking desk.  Sergeant Kevin Tobin started asking Charles Sylva questions.  Charles Sylva just kept yelling for his brother John and Arthur Tobin (the clerk-magistrate).  Defendant Tobin continued to try to talk to Charles Sylva but he just yelled over him.  Ex. B at 15-16.  Defendant Tobin started to book Charles Sylva by pulling up his name on the computer, but could not continue with the booking because Charles Sylva would not answer the questions.  Ex. C at 20-21.

6. After a couple of minutes, Sergeant Tobin said Charles Sylva should be brought down to the cell area.  Ex. B at 17; Ex. C at 22-23.   On his way to the cell, Charles Sylva was still yelling, and asking for his brother John (Sylva, a Massachusetts State Trooper) and Arthur Tobin.  Ex. B at 17; Ex. C at 24.

7. Defendant Tobin described Charles Sylva's demeanor as "excited" and stated that Sylva was uncooperative when they tried booking him.  Sylva's voice was raised, he was yelling, he was upset, he was loud; he appeared to be under the influence of alcohol or drugs.  Ex. C at 18, 19.

8. Defendant Tobin smelled alcohol, and also thought he was on drugs because Charles Sylva was excited and uncooperative, and saying "My brother is a trooper and McGolliff...."  Ex. C at 66.  Sometimes when people are drunk, they are slurring, and

       Charles Sylva was not slurring. He was excited and talkative, which Defendant Tobin associated more with drug use. Ex. C at 67.

9. Since the booking process could not be completed due to Charles Sylva's unstable state, the desk sergeant and booking officer, Defendant Tobin, ordered that he be placed in a cell. Ex. C at 18. Prior to being placed in the cell, Charles Sylva repeatedly pleaded not to be locked up. Ex. B at 38.

10. Defendant Tobin also told Defendant Kelley, the Shift Commander that he could not complete Charles Sylva's booking. Ex. C at 39. Defendant Kelley was in violation of General Order #91-63 (3.2) which makes the Shift Commander "specifically responsible for the safety of all persons." See General Order #91-63 (3.2), attached hereto as Exhibit J.

11. Defendant Tobin asked Defendant Borden to go along to the cell block in case there was a problem. Ex. C at 25. Defendant Tobin did not give any directives or orders as to how Charles Sylva was to be put in the cell. Ex. C at 26-27. Charles Sylva said to O'Brien at the cell door, "please don't lock me up." Ex. B. at 38. Defendant Tobin also said that Charles Sylva kept yelling for people to get him out, but he does not recall specifically to whom Charles Sylva was yelling. Ex. C at 42-43.

12. Defendant O'Brien testified that the handcuffs were taken off Charles Sylva when he was put the cell because Defendant O'Brien is the one who did it. Ex. B at 21, 48. It was also Defendant Tobin's understanding that the handcuffs were taken off. Ex. C at 81. As far as Defendant O'Brien understands it, handcuffs are not supposed to be left on when someone is put into a cell. Ex. B at 34.

13. According to Defendant Tobin, handcuffs could be left on for the safety of the officer if the prisoner is violent and it is not safe to uncuff him. He believes uncuffing the prisoner is within the discretion of the officer. Ex. C at 34. There is no written or unwritten policy as to when handcuffs are left on or taken off; it is up to the individual officer. Ex. C at 34-35, 78. Also, Defendant Tobin did not receive any training as to when he should or should not take off the handcuffs in light of the prisoner's demeanor. Ex. C at 36. So, if the officer felt his safety was at issue, a prisoner was not falling down drunk, and he

was a threat to himself, then it would be appropriate to leave on the handcuffs.  Ex. C at 77.

14. Defendant Crowley does not recall the regulations as to handcuffing a prisoner while in a cell.  Crowley Deposition, Ex. E at 53-54.  Defendant Crowley usually does not handcuff prisoners.  However, if the prisoner is combative or Defendant Crowley cannot get the handcuffs off, he will leave them on.  If the prisoner is not combative, he makes every attempt to get the handcuffs off.  Ex. E at 54; Ex. C at 83.  If the handcuffs are left on the prisoner, it is hard to move around in the cell and to break a fall.  Ex. E at 54-55.

15. Charles Sylva was handcuffed when placed in the cell, according to an eyewitness.  According to several witnesses, Charles Sylva jumped about the cell and banged his head against the walls uninterrupted for almost an hour.  Another prisoner in the cell opposite Charles Sylva told investigators that Charles Sylva "was handcuffed and kept jumping from the toilet to the wall, hitting his head.  He was going back and forth in his cell.  He kept falling on his back, landing on the floor and whacking his head on the wall."  See Ex. G.

16. Normally, the handcuffs are taken off right at the booking desk if the prisoner is compliant.  Ex. B at 35.  The handcuffs were not taken off Charles Sylva at the booking desk, according to Defendant O'Brien, because Sylva was not answering questions, he was yelling over Defendant Tobin.  Ex. B at 35-36

17. Whenever Defendant O'Brien went to the cell area, Charles Sylva had his face pushed up against the door, asking for his brother John and Arthur Tobin.  Ex. B at 35-36.  Defendant O'Brien informed Defendant Tobin of this.  Ex. B at. 46; Ex. C at 21-22.  Defendant O'Brien told the State Police that Sylva was "banging himself around the cell [and]. . . smashing his head off the window, acting deranged."  Michael Gavin, who was across the cell block from Sylva, told the State Police that Sylva was "flopping his body around the cell and banging his head off of the wall."  Ex. G.

18. Charles Sylva had previously been diagnosed as suffering from paranoid schizophrenia.  *See* Ex. I.  The Quincy police had received many calls on prior occasions relative to Charles Sylva's bizarre and paranoid behavior and they had brought him to hospitals and treatment centers on other occasions. Ex. E at 24.

19. Defendant Robert Crowley is the police chief for the City of Quincy. Ex. E at 6. On the night of the incident, Defendant Crowley was the detective captain, although he was not on duty at the time. Ex. E at 22. He had a previous encounter with Charles Sylva had been at a Friendly's in Wollaston, Massachusetts. An Officer Colletti had responded to a call and confronted Charles Sylva who ran into a nearby cellar and would not come out. Ex. E at 24. Defendant Crowley was asked to go down to the scene because he knew Charles Sylva. So he went to the Friendly's, talked to him, and told him that he was under arrest. Ex. E at 24-25. Defendant Crowley knew that Charles Sylva was prone to getting into fights and was a drinker. Ex. E at 26-27. During an incident in early 90's, when Defendant Crowley put the Plaintiff in a cell, he started yelling and screaming. Ex. E at. 25. Defendant Tobin also knew Charles Sylva from prior dealings in the Quincy area. Ex. C at 9. Defendant Tobin knew that Charles Sylva had difficulties on other occasions. Ex. C at. 13. Defendant Tobin was also aware that Charles Sylva had problems with alcohol. Ex. C at 11-12.

20. There is a bench and bar in the holding cell. Ex. E. at 30. When a prisoner is put in the holding cell, if he is combative, has a problem standing, or if he is drunk and might fall, he could be handcuffed to the bar. There are no Quincy Police Department regulations as to under what circumstances someone should be put in the holding cell or hooked up to the bar. Ex. E at 31-32.

21. Sometimes, if a prisoner cannot be booked right away, he is put in a cell with a bench that he is cuffed to until he can be booked. Charles Sylva was not put in that cell. Although he was in no condition to be booked, he was put in a regular cell. Ex. C at 32-33.

22. In violation of City of Quincy police regulations, Charles Sylva was not sent to a hospital on this occasion nor was he seen by any health care personnel. *See* City of Quincy Police Department General Order #91-63(3.4), attached hereto as Exhibit F. That order requires that any prisoner in need of medical attention be transported to Quincy Hospital emergency room and that if the prisoner appears mentally ill or unstable, that South Shore Mental Health be notified

23. According to Defendant Crowley, a prisoner would only be sent to the hospital, if he complains of chest pains, shortness of breath, or passes out. Ex. E at 51. If a prisoner is jumping around, falling down, and banging his head, he should be restrained or could be taken to the hospital. Ex. E at 53; Ex. C at 84-85.

24. Defendant Tobin did not consider sending Charles Sylva to the hospital. Ex. C at 67, 73. Defendant Tobin understands the regulation which requires that if someone has mental illness or needs medical attention, he is sent to the hospital. Tobin Deposition, pp. 72-73.

25. According to Defendant Crowley, the officer in charge is responsible for deciding whether someone should go to the hospital if he believes the person needs medical attention. Ex. E at 56-57.

26. Although they did not bring him to the hospital, Defendant O'Brien wanted to keep an eye on Charles Sylva because he kept yelling and screaming for Arthur Tobin and his brother John. Ex. B at 19. Defendant Tobin did not think it was necessary to go down and personally check on Charles Sylva because it was Saturday night in the cellblock and people were yelling a lot. Ex. C at 44-45.

27. It is the responsibility of the wagon officer to look at the monitor. O'Brien Deposition, p. 19. The wagon man is also supposed to go down and check the cells every 15 minutes, or when there is a disturbance. Ex. C at 29-30, 46. The chauffeur assists the wagon man. Ex. C at 60-61. Defendant Nichols was the chauffeur that night and was sitting at the monitors with Defendant O'Brien. Ex. C at 61.

28. Defendant Tobin did not, at any point, check on Charles Sylva when he first heard him yelling. Ex. C at 28-29. Defendant Tobin also did not inquire of the wagon man as to how Charles Sylva was doing. Ex. C at 30.

29. When Defendant O'Brien observed Charles Sylva in the cell, he saw him running around the cell, yelling and banging on the walls. See State Police Interview of Patrolman O'Brien, attached hereto as Exhibit H. Defendant O'Brien described Charles Sylva's behavior as "berserk" because it was out of the ordinary. Ex. B at 41. By "berserk", Defendant O'Brien meant "out of control", yelling, screaming, and jumping up and down. Ex. B at 43.

30. Defendant O'Brien saw Charles Sylva jumping around in his cell about 20-25 minutes after he came in. Defendant Nichols told Defendant O'Brien that Charles Sylva was jumping from the bed to the toilet to the floor and kept going around. Ex. B. at 23. Defendant O'Brien told Defendant Tobin that Charles Sylva was jumping from the bed to the toilet to the floor and kept going around. Defendant Tobin did not think it was important to watch Charles Sylva closely in light of his history and demeanor when he came in because in Defendant Tobin's opinion, Charles Sylva was intoxicated. This was despite the fact that he was more vocal than the other prisoners and was ranting and raving, and yelling and screaming. Ex. B at. 23.

31. Defendant O'Brien continually observed Charles Sylva jumping into the wall, but claimed that he was not actually driving his body into the walls. He did know that Charles Sylva was using the walls like a ricochet to get up on the bench, to the toilet, and then to the floor because he could see him through the plexiglass doors. Ex. B at 28.

32. When Defendant O'Brien was out front doing paperwork, Charles Sylva was on the monitor, then disappeared off the monitor. After a few minutes, Defendant O'Brien asked Defendant Nichols if Charles Sylva was back up, and Defendant Nichols said no. Ex. B at 29-30. Defendant O'Brien and Nichols then went to the cell area and were the first ones to find Charles Sylva unconscious, at around 5 AM. Ex. B at 30.

33. Defendant Tobin had called Defendant Crowley earlier on an unrelated matter and Defendant Crowley could hear someone yelling in the background. Ex. E at 22. Defendant Tobin informed Defendant Crowley that the person he heard was Charles Sylva. Ex. E at 57. Defendant Tobin told Crowley that Charles Sylva was in a cell yelling and screaming. Ex. E. at 23, 41. Defendant Crowley did not direct Defendant Tobin to do anything specifically about Charles Sylva. Ex. C. at 58.

34. Defendant O'Brien did not see blood on the wall, floor, or around the cell when he went in and found Charles Sylva unconscious. Ex. B at 30. However, Defendant O'Brien saw a blood smear on the wall above where Charles Sylva's head was and assumed that Charles Sylva struck his head on the wall. Ex. B at 30-31, 52. Defendant O'Brien did not notice anything wrong with Charles Sylva's wrist or knuckles. Ex. B at 52. Defendant Tobin saw blood on Charles Sylva's forehead. Ex. C at 87.

35. Defendants O'Brien and Nichols then went into Charles Sylva's cell and rolled him over. He was ash-colored, and they could not find Charles Sylva's pulse. Ex. B. at 31; Ex. C at 63-64. Defendant Tobin did not look at Charles Sylva's arms or wrists, except to take a pulse. Ex. C at 64.

36. Defendant Lieutenant Kelley, the shift supervisor, informed Defendant Crowley that Charles Sylva was unconscious in a cell. Ex. E at 20-21, 45.

37. Defendant O'Brien saw Charles Sylva jumping off the bench and toilet, Ex. B at 44, and onto the floor and walls. Ex. B at 25-26. By jumping onto the walls Defendant O'Brien meant that Charles Sylva was going from the bed or the metal bench on to the toilet to the floor; then he jumped onto the bench again, going around from one wall to the other. Ex. B at 26, 42.

38. O'Brien claims there was no restraining chair at that time at the police station but one came in about two years ago. Ex. B at 26. Defendant O'Brien saw a video of the chair at the Quincy Police Department but he was not actually shown how to put somebody in the chair. If the chair had been available the night Charles Sylva was brought in, and if Defendant Tobin had said it was okay to use the chair, Defendant O'Brien would have put Charles Sylva in the chair. Ex. B at 26, 27. If a prisoner is in the restraining chair, there is no way he can move; if he is hooked up to the bar in the cell, he can probably still stand up and hurt himself. Ex. E at 34.

39. In fact, the restraining chair was in the Quincy Police Department's possession on the day of the incident and may have been available for use at that time. Ex. E at 35-36. Yet Defendant Crowley was not aware if there were any regulations concerning the use of the chair. Defendant Crowley was also not aware if there were any regulations concerning the use of the bench and bar in the holding cell. Ex. E at 37.

40. Defendant Crowley gave no directives when told that Charles Sylva was ranting and raving, because he claimed there was no reason to. Ex. E at 42. Defendant Crowley stated that Charles Sylva could have been taken out of the cell, put on a board and strapped down, or the chair could have been used. He claims the bench and bar could not have been used because they would not prevent him from hurting himself. Ex. E at 44.

41. Defendant O'Brien did a written report and State Troopers interviewed him the day after the incident. Trooper Diane Lilly put in her report Defendant O'Brien statement that he saw Charles Sylva smashing his head off the window. Ex. B at 44. Defendant O'Brien told Trooper Lilly that Charles Sylva was acting deranged because every time they would try talking to him, he would scream. Ex. B at 45-46. Defendant O'Brien later said that he was misquoted, that Charles Sylva was not smashing his head but was pushing it up against the window. Ex. B at 45. Defendant O'Brien said that if Charles Sylva had been smashing his head off the window, he would have told Defendant Tobin that they had to go in the cell and get him because he was hurting himself. They would have also tried to get Charles Sylva to stop hurting himself and take him to the hospital if necessary. Ex. B at 47.

42. Unfortunately, only after Charles Sylva was found on the floor unconscious did anyone look into whether or not the machine, which reminds the officers to check the cells, was working the night in question. Ex. C at 51.

43. Charles Sylva's death was a medically untreated, violent and prolonged acute psychosis with exhaustion and cerebral concussion due to multiple head traumas while he was the full custody and under the complete control of the police. Charles Sylva's death would have been avoided if he had been brought to a medical facility as he had been in the past when his obviously unstable condition demanded it. See Ex. I.

44. The Quincy Police Department was aware of the risks associated with handcuffing unstable prisoners in cells as a prior detainee, who was intoxicated, suffered severe injuries when he fell while handcuffed behind his back, causing serious brain damage. See Police Reports, attached hereto as Exhibit D.

45. The Plaintiff presented his negligence claim within the two-year time period required by state law. See M.G.L. ch. 258 letter and return or service, attached hereto as Exhibit K.

Respectfully submitted,
The Plaintiff John Sylva, Administrator
of the Estate of Charles Sylva,
By his attorneys,

          //S//Stephen Hrones
          Stephen Hrones (BBO No. 242860)
          Jessica D Hedges (BBO No. 567431)
          HRONES GARRITY & HEDGES LLP
          Lewis Wharf-Bay 232
          Boston, MA 02110-3927
          T) 617/227-4019

**CERTIFICATE OF SERVICE**

    I, Jessica D Hedges, hereby certify that on this ___ day of May, 2005, I served one true and correct copy of the foregoing PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS, where unable to do so electronically, by United States First-Class Mail, postage prepaid, as follows: Douglas I Louison, Esq., James W Simpson, Jr., Esq., MERRICK LOUISON & COSTELLO, 67 Batterymarch St, Boston, MA 02110.

          //S//Jessica D Hedges
          Jessica D Hedges