UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


JOHN SYLVA, Administrator of
the Estate of CHARLES SYLVA,
    Plaintiff,

                              CIVIL ACTION NO.
    v.                          03-12473-MBB


CITY OF QUINCY, MICHAEL O'BRIEN,
GERRY NICHOL, JAMES BORDEN, KEVIN TOBIN,
ROBERT CROWLEY and JOHN KELLY,
    Defendants.


**MEMORANDUM AND ORDER RE:**
**MOTION OF DEFENDANTS CITY OF QUINCY, MICHAEL O'BRIEN, GERRY**
**NICHOL, JAMES BORDEN, KEVIN TOBIN, ROBERT CROWLEY AND JOHN**
**KELLY FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 17)**

**July 28, 2005**


**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment
filed by defendants City of Quincy, Michael O'Brien, Gerry
Nichol, James Borden, Kevin Tobin, Robert Crowley and John
Kelly (collectively: "defendants"). (Docket Entry # 17).
Having had a hearing on June 6, 2005, the motion (Docket Entry
# 17) is ripe for review.


SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); National Amusement, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Cochran v. Quest Software, 328 F.3d 1, 6 (1st Cir. 2003). A "genuine" factual issue exists where the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." National Amusements, 43 F.3d at 735 (citing Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986)); accord Cochran, 328 F.3d at 6. A "material" fact "means that a contested issue of fact has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 428 (1st Cir. 1996); accord Podiatrist Ass'n, Inc. v. La Cruz Azul de Puerto Rico, Inc., 332 F.3d 6, 13 (1st Cir. 2003); U.S. v. One Parcel of Real Property, 960 F.2d 200, 204 (1st Cir. 1992). Disputed facts and inferences are drawn in favor of the nonmoving party, plaintiff John Sylva ("plaintiff"), Administrator of the Estate of Charles Sylva ("Sylva"), the late brother of plaintiff. Anderson v. Liberty

Lobby Inc., 477 U.S. at 248; Gulf Coast Bank & Trust Co. v.
Reder, 355 F.3d 35, 39 (1st Cir. 2004); Mullin v. Raytheon
Company, 164 F.3d 696, 698 (1st Cir. 1999).


## PROCEDURAL BACKGROUND

In December 2003, plaintiff filed the complaint setting
forth four causes of action.  (Docket Entry # 1).  Defendants
argue that they are entitled to summary judgment on all four
counts in the complaint.

Count I alleges a violation of the Eighth Amendment
against defendants Michael O'Brien ("defendant O'Brien"), Gerry
Nichol ("defendant Nichol"), James Borden ("defendant Borden"),
Kevin Tobin ("defendant Tobin"), Robert Crowley ("defendant
Crowley") and John Kelly ("defendant Kelly") (collectively:
"individual defendants"), all police officers with the Quincy
Police Department, under 42 U.S.C. § 1983 ("section 1983").
Count II alleges a violation of the Eighth Amendment under
section 1983 against defendant City of Quincy ("the City of
Quincy").  Counts I and II allege the violation resulted from
defendants' deliberate indifference toward the welfare of
Sylva.  With respect to Count I, defendants move for summary
judgment, contending that they did not possess the requisite
state of mind to have been deliberately indifferent towards the
medical needs of Sylva.  (Docket Entry # 17).  Defendants

Kelly and Crowley further assert that as supervisors they did not exhibit deliberate indifference. (Docket Entry # 17). The City of Quincy contends Count II should be dismissed for plaintiff's failure to submit any evidence of an unlawful custom, practice, or policy of the City of Quincy. (Docket Entry # 18).

Count III alleges a state civil rights violation under Massachusetts General Laws chapter 12, section 11I ("M.G.L. c. 12"). (Docket Entry # 1). Defendants assert that plaintiff has submitted no evidence that they violated this statute. (Docket Entry # 17). Count IV alleges a negligence claim against the City of Quincy under Massachusetts General Laws chapter 258 ("M.G.L. c. 258"). (Docket Entry # 1). Defendants argue that all claims brought under M.G.L. c. 258 must be dismissed for plaintiff's failure to properly send a presentment letter to any executive officer of the City of Quincy as mandated by section 4 of M.G.L. c. 258. (Docket Entry # 17).

As a final argument, individual defendants assert they are entitled to qualified immunity under section 1983 because they acted in an objectively reasonable manner under the circumstances. (Docket Entry # 17). Plaintiff opposes entry of summary judgment. (Docket Entry # 20).

FACTUAL BACKGROUND

Construed in plaintiff's favor, the summary judgment record shows the following facts. Prior to his death, Sylva had a history of unusual behavior. He had previously been diagnosed as suffering from paranoid schizophrenia. (Docket Entry # 21, Ex. I, p. 4). He also had a history of acting excited when placed under arrest. (Docket Entry # 18, Ex. G, pp. 18-21). Most defendants, furthermore, were familiar, at least in part, with Sylva's history.[1] (Docket Entry # 18, Ex. I, pp. 27-28; Docket Entry # 21, Ex. E, pp. 27-28; Docket Entry # 21, Ex. I, pp. 24-29; Docket Entry # 18, Ex. C, pp. 14-15; Docket Entry # 21, Ex. C, pp. 14-15; Docket Entry # 18, Ex. G, pp. 17-18; Docket Entry # 21, Ex. B, p. 14; Docket Entry # 18, Ex. D, p. 14; Docket Entry # 18, Ex. H, p. 9). In addition, the Quincy police had received telephone calls regarding Sylva's behavior in the past and had brought him to hospitals and treatment centers on at least six prior occasions. (Docket Entry # 18, Ex. E, p. 24; Docket Entry # 21, Exhibit K, p. 2).

On December 17, 2000, the Quincy Police Department responded to a report of a man screaming in front of 39 Quincy Avenue. (Docket Entry # 21, Ex. A, p. 12). Upon arriving at 39 Quincy Avenue, Officer Thomas Gatea ("Gatea") observed Sylva

---

[1] The record contains no information regarding defendant Borden's knowledge of Sylva's previous behavior.

yelling to a group of firemen.  Gatea asked Sylva what the
problem was and Sylva responded that someone was trying to
shoot him.  (Docket Entry # 21, Ex. A, p. 12; Docket Entry #
18, Ex. B, p. 13).

Gatea placed Sylva under arrest for breaking and entering
with intent to commit a felony and malicious damage of property
and transported him to the Quincy Police Department for
booking.  (Docket Entry # 21, Ex. A, p. 12; Docket Entry # 18,
Ex. B, p. 22).  At some point before arriving at the station,
Gatea put leg irons on Sylva's wrists.  Gatea used leg irons on
account of Sylva's size.  (Docket Entry # 21, Ex. A, pp. 20-21;
Docket Entry # 21, Ex. G, p. 3).  During the ride in the police
cruiser, Sylva seemed to be "fine."  (Docket Entry # 21, Ex. C,
p. 17).

Upon arriving at the police station, Gatea left Sylva at
the sally port, the guarded entrance to the police station.
Defendant Borden and Police Officer Tom McGaya then took Sylva
to defendant O'Brien.  (Docket Entry # 18, Ex. D, pp. 15 & 50).
Defendant O'Brien escorted Sylva to defendant Tobin who was at
the booking desk.  (Docket Entry # 21, Ex. G, p. 4).

During booking, Sylva began acting "excited."  (Docket
Entry # 21, Ex. C, p. 18).  Defendant Tobin smelled alcohol on
Sylva and also thought Sylva was on drugs.  (Docket Entry # 21,
Ex. C, pp. 66-67).  Defendant O'Brien noticed Sylva was

"agitated, beet red, [and] sweating profusely." (Docket Entry
# 21, Ex. H, p. 2). A fellow prisoner later noticed Sylva was
sweating when he was placed in his cell. (Docket Entry # 21,
Ex. G, p. 13). Additionally, during booking Sylva was yelling
out repeatedly for his brother (plaintiff) who is a state
trooper, and for Arthur Tobin, a clerk magistrate. Sylva also
claimed somebody was trying to kill him and was acting paranoid
and out of touch with reality. (Docket Entry # 18, Ex. G, pp.
15-16).

Despite Sylva's excited state, neither defendant Nichol
nor defendant Tobin thought Sylva seemed to be in need of
medical attention. (Docket Entry # 18, Ex. G, p. 15; Docket
Entry # 21, Ex. C, pp. 44-45). The City of Quincy does,
however, have regulations regarding when to send a prisoner to
a hospital, including situations when the prisoner seems to
possess a mental state requiring medical attention. (Docket
Entry # 21, Exhibit F, ¶ 3.4).

Defendant Tobin was unable to complete the booking of
Sylva because he would not answer the required questions.
(Docket Entry # 18, Ex. C, p. 20). In the Quincy Police
Department, when the booking officer cannot book a detainee
immediately, the police officer may either place the detainee
in a cell or place the detainee in a holding cell with a bench
and handcuff the detainee to a railing referred to as a "bar."

(Docket Entry # 21, Ex. E, pp. 30-32; Docket Entry # 18, Ex. C, pp. 32-33).  The Quincy Police Department may have implemented the bar after an incident when the Quincy police took to the hospital a drunk handcuffed detainee who had fallen.  (Docket Entry # 18, Ex. I, pp. 30-33).  The Quincy Police Department does not have regulations regarding when to use the bar.  (Docket Entry # 18, Ex. I, pp. 30-32).

The Quincy Police Department also has a restraint chair for problematic detainees who are potentially dangerous to themselves.  Such a chair may have been available for use at the time of the booking.  (Docket Entry # 18, Ex. I, pp. 35-36).  Defendant Crowley does not remember if the City of Quincy has a policy regarding the use of the restraint chair.  (Docket Entry # 18, Ex. I, pp. 38-39).  Almost all defendants were unaware of regulations regarding the chair, except defendant O'Brien who had seen a video of the chair at the Quincy Police Department.  No one, however, had shown defendant O'Brien how to use the chair.  (Docket Entry # 18, Ex. D, pp. 26 & 27; Docket Entry # 21, Ex. G, pp. 34-35; Docket Entry # 18, Ex. I, p. 40).[2]

On December 17, defendant O'Brien did not think that Sylva needed to be restrained because he did not consider Sylva a

_____

[2]  The record contains no information concerning defendant Kelly's knowledge of the restraint chair.

threat to himself.  (Docket Entry # 18, Ex. D, pp. 24 & 41).
Defendants Nichol, O'Brien and Borden placed Sylva in a cell at
around 3:45 a.m.  (Docket Entry # 21, Ex. G, p. 3).  Sylva
stated to the officers at that time  "[P]lease don't lock me
up."  (Docket Entry # 18, Ex. D, pp. 38-39).

No one removed Sylva's handcuffs during booking because
Sylva would not answer questions.  (Docket Entry # 18, Ex. D,
pp. 35-36).  Although defendant O'Brien testified that he
removed the handcuffs when he placed Sylva in the cell (Docket
Entry # 21, Ex. B, pp. 17 & 21) another prisoner testified that
Sylva remained handcuffed.  (Docket Entry # 21, Ex. G, p. 13).
Additionally, Dr. Michael M. Baden ("Dr. Baden"), a medical
doctor, reported in his autopsy that Sylva had "prominent
circular handcuff abrasions around both wrists."  (Docket Entry
# 21, Ex. I, p. 3).

Whether handcuffs are to be removed prior to placing a
detainee in the cell is left up to the individual discretion of
the police officer.  Defendant O'Brien testified that handcuffs
are not supposed to be left on a detainee once placed in a
cell.  (Docket Entry # 21, Ex. B, p. 34).  Defendant Tobin
testified that handcuffs are left on for the safety of the
police officer in certain circumstances.  (Docket Entry # 21,
Ex. C, p. 34).  Defendant Crowley believes it is customary to
remove the handcuffs unless a detainee is combative.  (Docket

Entry # 21, Ex. E, p. 54).  Defendant Nichol testified that occasionally an officer will not remove a detainee's handcuffs. (Docket Entry # 18, Ex. G, pp. 22-26).

The record contains no written policy regarding the removal of handcuffs.  Having witnessed an intoxicated detainee wearing handcuffs fall and injure himself in the Quincy Police Station because he could not break his fall, defendants were aware of the risks of handcuffing.  (Docket Entry # 21, Ex. D).

Sylva, having been placed in the cell, began "smashing" his head off the window, "flopping" his body around, "slamming" around his cell, acting "deranged" and going "beserk [sic]."  (Docket Entry # 21, Ex. B, pp. 41-49; Docket Entry # 21, Ex. G, pp. 5 & 9).  Defendant Nichol noticed that Sylva was jumping from the bed to the toilet to the floor.  Defendant Nichol passed on this information to defendant O'Brien who subsequently relayed this information to defendant Tobin. (Docket Entry # 21, Ex. B, p. 28).  Sylva continued yelling throughout this time in the cell, which was approximately one hour.  Defendant Crowley overheard him yelling in the background when he spoke with defendant Tobin on the telephone. Defendant Crowley gave no directives at that time.  (Docket Entry # 21, Ex. B, pp. 22, 42 & 44; Docket Entry # 18, Ex. D, p. 16).

On the night in discussion, defendant O'Brien as the "wagon man" was responsible for watching the monitor playing a visual picture of the cell and checking on the prisoners in the cells every 15 minutes. Defendant Nichol as the "chauffeur" also was watching the monitor. (Docket Entry # 18, Ex. C, pp. 29-30, 46 & 61). Defendant O'Brien went down to check on the prisoners in the cell block every 15 minutes. He recorded these checks manually in a log since the automated Detex System was not functioning properly. (Docket Entry # 21, Ex. B, pp. 20 & 33; Docket Entry # 21, Ex. G, p. 14). At one point defendant O'Brien told Sylva to "knock it off." Defendant O'Brien, however, never went inside the cell to check on Sylva because he could see him through the plexiglass window. (Docket Entry # 18, Ex. D, pp. 24 & 29).

Sylva disappeared off the picture on the monitor a few minutes before 5 a.m. After a few minutes, defendant O'Brien asked defendant Nichol if Sylva had reappeared and defendant Nichol said, "No." At around 5 a.m. defendants O'Brien and Nichol went to the cell area and found Sylva unconscious. (Docket Entry # 18, Ex. D, p. 30).

When defendant O'Brien went into the cell he did not see blood on the wall, floor or around the cell although he saw a smear on the wall and assumed Sylva had struck his head. (Docket Entry # 18, Ex. D, pp. 30-31 & 52). Defendant O'Brien

11

saw blood on Sylva's forehead.  (Docket Entry # 18, Ex. D, p. 87).  Defendants O'Brien and Nichol could not find Sylva's pulse.  (Docket Entry # 18, Ex. D, p. 31; Docket Entry # 18, Ex. G, pp. 63-64).  Defendant Kelly informed defendant Crowley that Sylva was unconscious in a cell.  (Docket Entry # 18, Ex. H, pp. 20-21 & 45).

Dr. Leonard Atkins ("Dr. Atkins"), a medical doctor, determined the cause of death to be "Acute cocaine intoxication."  Dr. Atkins found no skull fractures or bleeding in the brain.  (Docket Entry # 18, Ex. G).  However, Dr. Baden, accompanied by his son Dr. Lindsey Baden and by Dr. Sara Fazzio, performed a second and subsequent autopsy and determined the cause of death to be "medically untreated violent and prolonged Acute Psychosis with Exhaustion."  They also discovered cerebral concussions due to multiple head traumas.  (Docket Entry # 21, Ex. I, pp. 4-5).

On December 12, 2002, a lawyer for plaintiff submitted a letter in reference to M.G.L. c. 258 which was served upon the Mayor of Quincy on December 13, 2002.  (Docket Entry # 21, Ex. K).

<u>DISCUSSION</u>

Plaintiff alleges a violation of Sylva's constitutional rights based upon the inadequate medical care Sylva received.

Plaintiff cannot sustain an Eighth Amendment violation because the protections of the Eighth Amendment against cruel and unusual punishment only attach after a prisoner's conviction. Hasenfus v. La Jeunesse, 175 F.3d 68, 71 n. 1 (1st Cir. 1999) (citing City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 243-245 (1983)). Thus, claims of constitutional violations by pretrial detainees are more appropriately analyzed under the substantive component of the Due Process clause of the Fourteenth Amendment. Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002); O'Connor v. Huard, 117 F.3d 12, 15 (1st Cir. 1997); see also Gaudraeult v. Municipality of Salem, Massachusetts, 923 F.2d 203, 208 (1st Cir. 1990) (holding that the rights implicated by a ten hour delay in providing medical care to a post-arrest detainee "are the due process protections afforded a pretrial detainee under the Fourteenth Amendment") (citing Bell v. Wolfish, 441 U.S. 520, 535, n. 16 (1979)). The standard applied to Fourteenth Amendment claims, however, is the same as the standard applied to Eighth Amendment claims. Burrell, 307 F.3d at 7.

The Supreme Court in Farmer v. Brennan, 511 U.S. 823 (1994), set forth a two part test for determining whether a prison official has violated the Eighth Amendment: the inmate must show a "substantial risk of serious harm" and that the prison official acted with a "sufficiently culpable state of

mind." Farmer v. Brennan, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)). A substantial risk of harm is one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person" would have noticed it. Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 18 (1st Cir. 1995) (quoting Gaudrealt, 923 F.2d at 208). To possess the required state of mind, the officer must first have been deliberate, i.e., he must have knowledge of facts from which he could infer a substantial risk of harm and he must make that inference. Id. at 837. Second, he must have been indifferent, i.e., the plaintiff must have had a serious medical need that was not adequately treated. Kosilek v. Maloney, 221 F.Supp.2d 156, 180 (D.Mass. 2002).

## I. Defendant Borden

Plaintiff fails to allege any facts establishing defendant Borden's liability for a constitutional violation. Judging from the facts, defendant Borden was only in Sylva's presence during the time when Sylva was brought from the sally port to the time when he was taken to his cell. Defendant Borden would have thus presumably only overheard Sylva's shouting for his brother and Arthur Tobin. Plaintiff does not allege defendant Borden's knowledge of Sylva's history of paranoid behavior nor does plaintiff allege that defendant Borden witnessed Sylva

injuring himself.  <u>See</u> <u>Mahan</u> 64 F.3d at 18 (where the defendant did not witness detainee's symptoms of medical need he could not be held responsible).  Plaintiff has failed to allege any evidence which demonstrates defendant Borden's knowledge of, and refusal to provide medical treatment to Sylva.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 252; <u>accord</u> <u>Torres v. E.I. Dupont de Nemours & Co.</u>, 219 F.3d 13, 18 (1st Cir. 2000) (finding that a "mere scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment.").  As a result, summary judgment on Count I should be granted to defendant Borden.

II.  <u>Defendants Nichol, O'Brien and Tobin</u>

Defendants Nichol, O'Brien and Tobin, however, were aware of Sylva's medical need.  Sylva was sweating profusely, acting "beserk [sic]" and banging his head against the cell wall. These signs would have been visible to these defendants and thus "obvious" indications that something was wrong medically or psychologically with Sylva.  <u>See</u> <u>Elliott v. Cheshire County</u>, 940 F.2d 7, 11 (1st Cir. 1991) (detainee's banging his head against the wall strengthened the inference that detainee expressed suicidal thoughts and therefore indicated a serious medical need); <u>compare</u> <u>Gaudreault</u> 923 F.2d at 203 (a broken nose was not a serious medical need because it was not obvious

to a layperson that it was a serious medical need). Furthermore, Dr. Baden's autopsy report attributed Sylva's cause of death to Prolonged Acute Psychosis with Exhaustion. "Prolonged" acute psychosis indicates a condition, and thus a risk of harm, existing at the time of Sylva's detainment. <u>Cf. Olsen v. Layton Hills Mall</u>, 312 F.3d 1304, 1316 (10th Cir. 2002) (whether panic attack caused by existing Obsessive Compulsive Disorder was a sufficiently serious medical need was a question for the jury).

Whether defendants Nichol, O'Brien and Tobin acted with deliberate indifference toward Sylva's needs is an issue of fact. The Court's subjective test for deliberate indifference indicates that deliberate indifference is "more than mere negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." <u>Farmer v. Brennan</u>, 511 U.S. at 835. Moreover, the Court held that a prison official may be liable under section 1983 for violation of the Eighth Amendment only if the official is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." <u>Id.</u> at 837.

Although Sylva did not verbally express intentions of harming himself, defendants Nichol, O'Brien and Tobin witnessed Sylva acting strangely and yelling statements indicating his

own confusion, in addition to physically harming himself while
in his cell.  Despite this outward manifestation of a disturbed
mind, however, defendants Nichol, O'Brien and Tobin did not
give him medical treatment.  See Elliott, 940 F.2d at 11-12
(finding that officers who knew of a detainee's self-
destructive behavior and did not provide medical attention may
have been deliberately indifferent); cf. Cortes-Quinones v.
Jimenez-Nettleship, 842 F.2d 556, 559-560 (1st Cir. 1988)
(prison officials who placed a schizophrenic inmate in the
general population of a prison without medical attention may
have been deliberately indifferent); compare Torraco v.
Maloney, 923 F.2d 231, 235 (1st Cir. 1991) (prison staff
members did not act with deliberate indifference where they did
not take additional actions beyond scheduling counseling
sessions for a suicidal inmate); Mahan, 64 F.3d at 18 (a
rational trier of fact would not be able to conclude that
prison officials were aware of a prisoner's symptoms because
they were never informed and never witnessed any symptoms).

       Furthermore, the Quincy police were aware of Sylva's
schizophrenic behavior, having taken Sylva to the hospital and
treatment centers in the past.  See Alsina-Ortiz v. Laboy, 403
F.3d 77, 83 (1st Cir. 2005) (a prison official who had been
informed of an inmate's "prolonged [and] manifest" condition
and did not provide immediate medical help may have been

17

deliberately indifferent); see also Olsen, 312 F.3d at 1317 (a prisoner exhibiting symptoms of Obsessive Compulsive Disorder may have indicated intentions to harm himself).

With regard to summary judgment motions for Fourteenth Amendment claims, "[b]ecause the element of 'deliberate indifference' requires a subjective inquiry, courts are cautious in granting summary judgment." Dias v. Vose, 865 F.Supp. 53, 57 (D.Mass. 1994). Moreover, "A state-of-mind issue such as the existence of deliberate indifference usually presents a jury question." Torraco v. Maloney, 923 F.2d at 234 (citing Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987)). As a result, the motion for summary judgment for Count I against defendants O'Brien, Nichol and Tobin should be denied.


III.  Defendants Crowley and Kelly

Plaintiff seeks to impose supervisory liability against defendants Crowley and Kelly. A plaintiff can establish supervisory liability if a supervisor's "action or inaction is affirmatively linked . . . to [the behavior of his subordinate officers] in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002). The plaintiff must also show that the supervisor knew that the training to

prevent constitutional violations was necessary.  <u>Hayden v.
Grayson</u>, 134 F.3d 449, 456 (1st Cir. 1998); <u>accord</u> <u>Estelle v.
Gamble</u>, 429 U.S. 97, 105-106 (1976) (finding that "an
inadvertent failure to provide medical care" is not deliberate
indifference).

        In the case at bar, plaintiff submitted no evidence that
defendant Kelly was aware of Sylva's history beyond knowing he
was "tough."  Kelly was not even present in the station to
witness Sylva's behavior.  <u>See</u> <u>Mahan</u>, 64 F.3d at 18 (prison
officials had no knowledge of prisoner's condition and were
therefore not deliberately indifferent); <u>cf.</u> <u>Layne v. Vinzant</u>,
657 F.2d 468, 474 (D.Mass. 1981) (supervisory official was not
liable for the harm suffered by a schizophrenic inmate where
the official did not know that the plaintiff's treatment was
inadequate).

        With respect to the claim against defendant Crowley, he
simply overheard Sylva yelling in the background during the
night of Sylva's death.  Although defendant Crowley was aware
of Sylva's history of paranoid behavior, he did not witness any
outward manifestations of a medical need such as Sylva's
banging his head off his cell wall.  <u>See</u> <u>Alsina-Ortiz</u> 400 F.3d
at 77 (finding that prison administrators were not liable for
deliberate indifference when they were not aware of guards'
failure to provide medical treatment to an inmate); <u>accord</u>

Elliot, 940 F.2d at 11 (finding no deliberate indifference where officials did not know about detainee's medical need); but see Layne v. Vinzant, 657 F.2d at 475 (supervisory liability can survive a motion for summary judgment where the official is put on notice of medical need through a doctor's notes and therefore may have acted deliberately indifferent).

Finally, with respect to both defendants Kelly and Crowley, the record also indicates the existence of the bar, the bench and the restraining chair.  Individual defendants have testified to knowing of these alternative restraint methods for detainees who are potentially harmful to themselves.  Based on the existence of these preventative measures, defendants Kelly and Crowley as supervisors could not have been deliberately indifferent to the needs of a self-harming detainee like Sylva.  See Manarite v. City of Springfield, 957 F.2d 953, 958 (1st Cir. 1992) (holding that where some suicide prevention policies and officer training exist, courts have not found supervisor liability for deliberate indifference) (citing Belcher v. Oliver, 898 F.2d 32, 34-36 (4th Cir. 1990)).  Summary judgment is therefore warranted for Count I against defendants Kelly and Crowley.


IV.  City of Quincy

Municipal liability under section 1983 cannot be based on a theory of respondeat superior. Monell v. New York Ciy Dept. of Soc. Services of the City of New York, 436 U.S. 658 (1978). Instead, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Board of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 403 (1997). Establishing municipal liability also requires the plaintiff to establish a direct link between a policy of the municipality and the constitutional violation. City of Canton v. Harris, 489 U.S. 378, 385-387 (1989). "Failure to train" police officers may constitute deliberate indifference on the part of a municipality under this standard. Id. A municipality is liable for a failure to train, however, only when the city has made "a deliberate choice to follow a course of action [sic] made from among various alternatives." Pembaur v. Cincinnati, 475 U.S. 469, 483-484 (1986); accord City of Canton, 489 U.S. at 388.

The City of Quincy did not violate Sylva's Fourteenth Amendment rights. The policies of the municipality do not demonstrate a lack of training that constitutes a constitutional violation. Plaintiff contends that the City of Quincy failed to train police officers in providing medical care to arrestees. The record, however, indicates that the City of Quincy did have a policy for dealing with potentially

21

mentally ill patients at the time of booking.  Defendants

Tobin, Nichol and O'Brien failed to provide medical treatment,

perhaps in violation of this regulation, but this failure

establishes the liability of the individual defendants and not

the City of Quincy.  See City of Canton, 489 U.S. at 386-387

(where a medical policy is itself not unconstitutional, the

municipality is not liable); see also Gallego v. Wilson, 882

F.Supp. 1169, 1172 (D.Mass. 1995) (finding that a single

extreme incident of a prison official's violence does not

indicate a lack of training).

    Furthermore, the Quincy Police Department has alternatives

to cells for restraining detainees who may be under the

influence or a danger to themselves.  Admittedly, the record

contains no evidence that the Quincy Police Department had

"regulations" for the use of the bar, the chair or the bench.

Moreover, no defendant suggested an alternative method of

restraint be used, perhaps because defendants were unaware of

its existence.  Despite the lack of use of this equipment, the

existence of the alternative methods of restraint suggests that

they were intended for employment and that the City of Quincy

was not deliberately indifferent to Sylva's needs.  See

Manarite, 957 F.2d at 953 (in order to show municipal

liability, the plaintiff must demonstrate that the municipal

policy caused the constitutional violation); contra Bordanaro

v. McLeod, 871 F.2d 1151, 1156-1157 (1st Cir. 1989) (a
constitutional violation involving many officers may indicate
an underlying policy).

The City of Quincy also is not liable for a failure to
train officers in the use of handcuffs on prisoners who may be
dangerous to themselves.  As stated above, the policy of a city
must indicate deliberate indifference towards the victim.  City
of Canton, 489 U.S. at 388.  In the case at bar, defendants
have testified that only detainees who are combative or
dangerous to themselves should remain handcuffed, otherwise
prison officials usually remove handcuffs when an inmate is
placed in a cell.  Furthermore, the Quincy Police Department
implemented other methods of detention indicating they did not
exhibit deliberate indifference.  See Manarite, 957 F.2d at 959
(finding that the city was not liable under section 1983 where
it implemented guidelines to prevent detainees from hurting
themselves).  Summary judgment is therefore appropriate for the
City of Quincy with respect to Count II.


V.   Liability Under M.G.L. c. 12

Plaintiff fails to demonstrate that defendants violated
Sylva's civil rights pursuant to M.G.L. c. 12 section 11I.
Under M.G.L. c. 12 sections 11H and 11I a plaintiff must
demonstrate that his rights secured under the laws or the

Constitution of United States or of the Commonwealth were interfered with by threats, intimidation or coercion.  Mass. Gen. Laws ch. 12 § 11I; <u>Bally v. Northeastern University</u>, 532 N.E.2d 49, 51-52 (Mass. 1989).

In the present case, plaintiff fails to submit evidence that defendants threatened, coerced or intimidated Sylva. Plaintiff has not put forth any evidence of verbal communication between Sylva and defendants beyond the booking officer's attempts at questioning for booking and Sylva's exclamations throughout his time in detention.  <u>See Layne v. Superintendent, Mass. Correctional Inst.</u>, 546 N.E.2d 166, 169 (Mass. 1989) (the plaintiff's Massachusetts Civil Rights Act claim failed where the plaintiff did not demonstrate that the defendants' actions "involve[d] an actual or potential physical confrontation accompanied by a threat of harm"); <u>cf. Bally</u>, 532 N.E.2d at 53 (requiring an athlete to submit to urine testing is not comparable to a "direct assault" on the plaintiff as found in successful Massachusetts Civil Rights Act cases); <u>compare Batchelder v. Allied Stores Corp.</u>, 473 N.E.2d 1128, 1131 (Mass. 1985) (a uniformed officer's order to Batchelder to stop distributing political fliers constituted intimidation). Accordingly, Count III does not survive summary judgment.  <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 252; <u>accord Torres</u>, 219 F.3d at 18 (finding that "the mere scintilla of

24

evidence is insufficient to defeat a properly supported motion for summary judgment.").


VI.  Lack of Presentment Letter Pursuant To M.G.L. c. 258

Presentment of a claim against a public employer is sufficient if presented to the mayor of a city.  Mass. Gen. Laws ch. 258 § 4.  During the June 6, 2005 hearing defendants acknowledged that plaintiff sent a presentment letter to the Mayor of Quincy and that the negligence claim was properly brought.  Summary judgment therefore should not be granted for Count IV on the basis of a lack of presentment.


VII.  Qualified Immunity

Plaintiff submits that defendants waived the defense of qualified immunity.  The defense of qualified immunity, however, is only waived if not raised in "a diligent manner during the post-discovery, pre-trial phase."  Guzman-Rivera v. Rivera-Cruz, 98 F.3d 664, 668 (1st Cir. 1996).  Furthermore, the "critical inquiry" is whether the timing of raising the defense deprived the plaintiff of notice.  Howes v. Hitchcock, 66 F.Supp.2d 203, 209 (D.Mass. 1999).

In the case at bar, defendants first sought qualified immunity in their memorandum in support of their motion for summary judgment.  Although plaintiff asserts that defendants failed to adequately address the issue of qualified immunity,

25

raising the defense in a summary judgment motion serves to put a plaintiff on notice of the defense.  Compare Guzman-Rivera, 98 F.3d at 668 (finding the defendants were not entitled to defense of qualified immunity where they only raised the defense in the *third* motion for summary judgment).

Defendants Tobin, Nichol and O'Brien, however, are not entitled to qualified immunity as a matter of law.[3]  In general, "[g]overnment officials performing discretionary functions are [sic] shielded from civil damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  McDermott v. Town of Windham, 204 F.Supp.2d 54, 61 (D.Me. 2002) (quoting Harlow v. Fitzgerald, 457, U.S. 800, 818 (1982)).  To assess the presence of qualified immunity, the First Circuit employs a three part test.  That test determines: "(1) whether [the] plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue."  Mihos v. Swift, 358 F.3d 91,

---

[3]  Because the section 1983 claim against defendants Borden, Crowley, Kelly and the City of Quincy would not survive summary judgment, analysis of their defense of qualified immunity is unnecessary.

98-99 (1ˢᵗ Cir. 2004); accord Kauch v. Dept. for Children,
Youth and Their Families, 321 F.3d 1, 4 (1ˢᵗ Cir. 2003).

As established above, defendants Tobin, O'Brien and
Nichol's actions, presented as Fourteenth Amendment violations,
do not survive a summary judgment motion.  Under the first
prong of the test, to demonstrate a constitutional violation,
plaintiff must first "specify the rights that have been
interfered with."  Kauch 321 F.3d at 4; accord Frazier v.
Bailey, 957 F.2d 920, 929 (1ˢᵗ Cir. 1992).  Plaintiff here
accused defendants of a constitutional violation for deliberate
indifference for failure to provide medical attention, thus
specifying an interfered with right.  See Hope v. Pelzer, 536
U.S. 730, 738 (2002) (finding in response to a qualified
immunity defense that prison officials violated constitutional
rights when they demonstrated deliberate indifference by
handcuffing a prisoner to a hitching post for seven hours);
compare Kauch, 321 F.3d at 4 (finding no constitutional
violation in conducting child abuse investigation because there
is no constitutional right to be free from child abuse
investigation).  Given the discussion in part II, plaintiff's
allegations, if true, set forth a violation of the Fourteenth
Amendment.

Turning to the second prong, by December 17, 2000 the
Supreme Court had already decided Farmer v. Brennan thus

27

establishing the criteria for deliberate indifference.  <u>Farmer</u> <u>v. Brennan</u>, 511 U.S. at 825; <u>Revere v. Mass. Gen. Hosp.</u>, 463 U.S. 239, 244 (1983) (finding that officials violate the Eighth Amendment where they deny medical care to detainees with serious medical needs).  Defendants therefore were put on notice they were violating plaintiff's constitutional rights. <u>See</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 639-640 (1987) (constitutional rights are "clearly established" where "in light of pre-existing law the unlawfulness [is] apparent"); <u>accord</u> <u>Hope</u>, 536 U.S. at 741 (holding that government officials are considered "on notice" that they violated established law where the law could have given them "fair warning").

Turning to the third prong, it is a genuine issue of material fact whether defendants Tobin, O'Brien and Nichol would have subjectively known their actions constituted constitutional violations.  Defendant O'Brien witnessed Sylva acting berserk.  Defendant Nichol observed Sylva throwing himself around the cell.  Defendant Tobin knew Sylva was throwing himself around the cell.  As a result, a genuine issue of material fact exists regarding whether these defendants were aware of Sylva's need for medical attention.  Whether their refusal to provide medical attention was made knowing such a refusal would be a violation of Sylva's Fourteenth Amendment rights likewise presents a genuine issue of material fact.  <u>See</u>

28

<u>Consolo v. George</u>, 58 F.3d 791, 794-795 (1st Cir. 1995)
(finding that prison officials acted unreasonably and therefore
were not entitled to qualified immunity where they denied
medical attention to a detainee with a broken pelvis); <u>compare</u>
<u>Belcher</u>, 898 F.2d at 36 (holding that defendants were entitled
to qualified immunity where their refusal of medical care to
detainee who demonstrated no signs of suicidal tendencies did
not constitute deliberate indifference); <u>Hegarty v. Somerset</u>
<u>County</u>, 53 F.3d 1367, 1380-1381 (1st Cir. 1995) (finding a
prison official was entitled to qualified immunity where he had
no notice of the constitutional violation involved).  Summary
judgment based on qualified immunity is therefore not
appropriate.

<u>CONCLUSION</u>

For the foregoing reasons, this court **ORDERS** that
defendants' motion for summary judgment (Docket Entry # 17) be:
(1) **ALLOWED** with respect to defendants Borden, Crowley and
Kelly's liability under Count I; (2) **DENIED** with respect to
defendants O'Brien, Nichol and Tobin's liability under Count I;
(3) **ALLOWED** with respect to the City of Quincy's liability
under Count II; (4) **ALLOWED** with respect to all defendants'
liability under Count III; and (5) **DENIED** with respect to the
City of Quincy's liability under Count IV.  Parties shall

29

appear for a status conference on September 9, 2005 at 10:15 a.m.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge